Joyce **HENDRICKS** and Connie Hellard, Appellants,

v.

**COMMONWEALTH** of Kentucky, Appellee.

No. 92–SC–662–DG.

Supreme Court of Kentucky.

Nov. 24, 1993.

Harry P. Hellings, Jr., Dean A. Pisacano, Covington, for appellants.

Chris Gorman, Atty. Gen., Robert E. List, Sp. Asst. Atty. Gen., Newport, for appellee.

WINTERSHEIMER, Justice.

This appeal is from a decision of the circuit court which affirmed a district court holding that Hendricks and Hellard were guilty of nude dancing in violation of a Newport city ordinance. Each defendant was sentenced to 30 days in jail and a fine of $100 which was conditionally discharged for a period of two years.

The circuit and district courts determined that the Newport ordinance did not infringe on any constitutionally protected rights and was not vague or overbroad, nor an unreasonable exercise of police power.

The questions presented are whether the Newport ordinance applied to a private club; whether the ordinance was an unreasonable exercise of police power and therefore unconstitutional; whether the ordinance is unconstitutionally overbroad and unconstitutionally vague; and whether the ordinance is unconstitutionally vague as applied to these defendants.

The Newport ordinance makes it unlawful "to appear in any public place" exposing "to view any portion of the pubic area, anus, vulva or genitals including certain portions of the breast unless covered by pasties" and defines "public place" by incorporating by reference the definition of public place in K.R.S. 525.010.

On July 18, 1991, a Kentucky state trooper in civilian clothes entered the Mousetrap Burlesque and Artistic Dance Preservation Society premises in Newport and paid a $5 cover charge. He was not requested to present identification, nor was he asked his name. He was given a membership card. The evidence indicated that the membership card was given to the trooper in anticipation of the incorporation of the Society as a nonprofit corporation on July 19. On July 19, the Society's articles of incorporation were filed in the Campbell County Clerk's office. The same trooper entered the premises on July 20, 1991 where he encountered the same doorman, but was informed he would have to pay $7 for a temporary membership fee, or pay a yearly membership. The trooper testified that the dancers inside the premises were nude on both evenings. On July 25, the defendants were cited for violating the Newport ordinance.

There was evidence presented to the district court that the nonprofit corporation holds regular meetings and is a private club and that the club has a yearly membership fee of $25 which entitles a member to five visits. A member is charged $5 for each visit to the club thereafter while nightly guest

passes are $7 and guests are limited to two visits per month. Prior to incorporation as a nonprofit entity, the Mousetrap was operated as an adult entertainment establishment. It was admitted that the nature of the dancing and adult entertainment had remained the same under the Society as it had previously been presented. There was testimony by Joan Craig, president, treasurer and principal incorporator of the Society, that she does not have the addresses of all the members and does not require members to give an address. The only method of notifying members of meetings is a leaflet which is kept in the club. It was also stated by the president that the only means of enforcing the two visit limit for nonmembers is that they have the same doorman. She also admitted that she did not expect the doorman to remember how many times an individual came into the club on a monthly basis. After hearing the evidence, the district judge held that the Mousetrap was not a private club but was open to the general public during the hours it was open for business. The defendants entered conditional guilty pleas to the offenses occurring on July 25. The circuit court affirmed the district court. Although the Court of Appeals declined to accept discretionary review, this Court did accept further review.

## I

The defendants claim that the city ordinance which prohibits nudity in a public place as defined by K.R.S. 525.010 does not apply to them because they were performing in a private club. We do not agree.

Although there are no reported Kentucky cases on this specific issue, this Court may consider decisions from other states which have reviewed this kind of situation.

The facts of this case are very similar to those in *City of Chicago v. Severini,* 91 Ill. App.3d 38, 46 Ill.Dec. 345, 414 N.E.2d 67 (1980). In that case, a Chicago police officer entered a so-called private club which was incorporated as a not-for-profit corporation. He was given a membership card without a request to make an application for membership and was charged a fee of $4 to enter. The membership fee was payable every time a customer returned. The club claimed to be a private club used only by members. The Illinois court determined that admission to the club and its entertainment was indiscriminately granted to any member of the public upon payment of the prescribed amount.

Another somewhat similar case, *Sharp v. State,* 495 S.W.2d 906 (Tex.Cr.Ct.App.1973), held that a $1 membership charge was nothing more than an extra dollar for the purchase of a ticket and that the so-called membership club was open to the public at large. *Carpenter v. Zoning Board of Appeals of Framingham,* 352 Mass. 54, 223 N.E.2d 679 (Supreme Judicial Court, Mass.1967), stated that a club is not created merely by incorporating as not-for-profit.

In regard to the standards for ascertaining membership in clubs where members are widely recruited and admitted with little inquiry into their backgrounds, *Roberts v. United States Jaycees,* 468 U.S. 609, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984), concluded that Jaycee chapters lack distinctive characteristics that might afford constitutional protection for the decision of its members to exclude women. Earlier, *Daniel v. Paul,* 395 U.S. 298, 89 S.Ct. 1697, 23 L.Ed.2d 318 (1969), determined that a recreational club in which a hundred thousand white people per season were given membership cards for the payment of a 25 cent fee was a subterfuge designed to avoid the Federal civil rights act.

■ Finally, Hendricks and Hellard cite *United States v. Lansdowne Swim Club,* 713 F.Supp. 785 (E.D.Pa.1989), which noted eight factors in determining a private versus a public club and stated that the most important of these factors is the genuine selectivity of the membership. The first factor is the substantiality of membership dues. Here, the membership fee is not substantial and only gives a $2 savings per visit to those who pay $25 initially instead of paying the nightly $7 entrance charge. A second factor is the numerical limit on club membership. The Mousetrap Society has no numerical limit on its membership. Next is the membership control over selection of new members. Mousetrap members have no control over the acceptance of other members. A fourth fac-

tor is the formality of the admission procedures of the club. In this case, there are no formalities to the admission of new members. Although there is a reference to a membership oath dispensing with formalities, there is no evidence of any oath being administered in this case. A final factor is the standard· for admission and here there is none.

Other elements described in *Lansdowne, supra,* are the membership's control over the operation of the establishment, the purpose of the club's existence, use of the facility by nonmembers and history of the organization.

In this situation there was no evidence presented regarding any membership control over the operations of the establishment. The history of the Mousetrap organization indicated that it immediately followed the operation of Bright-lights Inc., a predecessor corporation for profit, and presented exactly the same form of adult entertainment. The evidence indicated that the Society was established for the sole purpose of avoiding the requirements of a newly enacted city ordinance regarding nudity in a public place. The testimony indicated that there was no control over the use of the facility by nonmembers because they were routinely admitted upon the payment of a fee without any other condition.

We agree with the district court and circuit court that based on the evidence, admission to the Mousetrap Society and its entertainment was indiscriminately granted to any member of the public on the payment of an admission fee. The facts here demonstrate that there is no permanency in the alleged membership and none of the other traditional features of a private club exist in this situation. Consequently the Society is not a private club but rather a public club and a place of public accommodation.

### II

We must now consider whether the Newport ordinance is an unreasonable exercise of police power and whether it is constitutional.

The Newport ordinance incorporates by reference K.R.S. 525.010 as a definition for a public place. The preamble to the subject ordinance states in part that it is the intent of the city commission to promote public health, safety and welfare and to restrict the act of being nude in such places as are frequented by the general public. Section 3 of K.R.S. 525.010, which has been incorporated by reference in the Newport ordinance, states in pertinent part that a public place means a place to which the public or a substantial group of persons has access.

■ Hendricks and Hellard argue that the city ordinance is an unreasonable exercise of police power because it attempts to regulate activity in a private place. We disagree because the patrons of this establishment and the entertainers and employees had no expectation of privacy because anyone from the general public was admitted upon the payment of an admission fee.

■ The sweep of this ordinance is not overbroad and does bear a reasonable relationship to its stated purpose. It does not operate unreasonably beyond the occasion or necessity of the particular situation. An Indiana state statute similar to the Newport city ordinance has recently been considered by the United States Supreme Court in *Barnes v. Glen Theatre, Inc.,* 501 U.S. ——, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991).

As noted before, there is no Kentucky case considering these questions. *Barnes, supra,* addresses an Indiana statute making it a misdemeanor to appear in a public place in a state of nudity and a First Amendment challenge that the nude dancing in question was expressive conduct protected by the First Amendment. *Barnes* is a plurality decision, holding by a 5 to 4 margin that the Indiana statute was constitutional and with 4 votes of the majority opinion providing a "four-part inquiry" to be used in analyzing when a law of this nature infringes on First Amendment rights. The *Barnes* majority determined that the statute was valid as long as the evil the Indiana law sought to address was not erotic dancing but rather public nudity and the statute was narrowly tailored to achieve the purpose of the state.

In *Barnes,* the U.S. Supreme Court applied the four-part test originally enunciated in *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), to deter-

mine that the Indiana statute was constitutional. This case is of particular interest in this situation because the U.S. Supreme Court determined that the Indiana statute in that case did not prohibit nudity simply because of the erotic message conveyed by the dancer. Although the dancing may have had a communicative element, it was not the dancing that was prohibited but only because it was being performed in the nude. As with the Indiana case, here, the Newport ordinance does not deprive the dancing of its message, but only makes it less graphic.

In addition the Newport ordinance does not violate the fourth part of the *O'Brien, supra,* test relating to incidental restrictions on the freedom of expression guaranteed by the First Amendment to the Federal Constitution. The Newport ordinance, which requires only a slight amount of clothing, is similar to the Indiana statute and is modest and the bare minimum necessary to achieve the city's purpose.

The amount of clothing required does not interfere with the expression sought to be conveyed by clogging, Appalachian dancing, the two-step, Indian tribal dancing, belly dancing, and striptease and/or the traditional burlesque comedy.

It is important to remember that in our consideration of this case, we must first determine that the Newport city ordinance has not banned nude dancing, but has prohibited *public nudity.* Moreover, the ordinance does not attempt to regulate a nudist society. In taking such action, the City of Newport is in conformity with the statutory law of Kentucky which regulates nudity. K.R.S. 232.-010.

Hendricks and Hellard argue that *Doran v. Salem Inn,* 422 U.S. 922, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975) is authority that the Newport ordinance is overbroad. Once again, we turn to the *Barnes, supra,* decision to find similarities. As in this case, the similarity is that the Supreme Court of Indiana has determined that the Indiana statute prevents nudity in places of public accommodations, such as the club considered here.

Hendricks and Hellard contend that the Newport ordinance is overbroad because it could apply to an athletic club or a dressing room in a clothing store and that it is vague because persons of ordinary intelligence would not know what conduct is prohibited. In fact, the Newport ordinance gives more guidance to the public as to what is a public place than does the Indiana statute which has already been determined to be constitutional. K.R.S. 525.010. The examples given by Hendricks and Hellard of the locker and dressing rooms are without merit because in a department store dressing room, a person is generally alone and in a rather narrow and confined space, and consequently in a private place within a place of public accommodation. Generally, in the school locker room or athletic club, there is no mixing of the sexes, nor does it present a forum where a clothed audience is confronted by individual nudity. In addition, in the locker room or athletic club, the nudity is frequently brief and is a transition between street clothing and athletic clothing. Again, the locker room example usually involves a private domain within a public place similar to a rest room. There is also the obvious difference between a total state of undress or nudity and a state of passing or transitional changing of clothing. There is a clear expectation by users of locker and dressing rooms that they are private places.

An earlier disorderly conduct statute, K.R.S. 437.016, which is now repealed, contained the public place language similar to that in K.R.S. 525.010 and has already survived the challenge of being overbroad and vague. *Colten v. Commonwealth,* 407 U.S. 104, 92 S.Ct. 1953, 32 L.Ed.2d 584 (1972), upheld the statute and stated in part that the root of the vagueness doctrine is a rough idea of fairness. It is not a principle designed to convert into a constitutional dilemma the practical difficulties in drawing criminal statutes both general enough to take into account a variety of human conduct and sufficiently specific to provide fair warning that certain kinds of conduct are prohibited. As asserted in *Colten v. Commonwealth,* Ky., 467 S.W.2d 374 (1971), "We believe that citizens who desire to obey the statute will have no difficulty in understanding it...."

The interpretation of statutes can be applied to this city ordinance. We find instructive the language of 73 Am.Jur.2d *Statutes* § 265:

A statute subject to interpretation is presumed not to have been intended to produce absurd consequences, but to have the most reasonable operation that its language permits. If possible, doubtful provisions should be given a reasonable, rational, sensible and intelligent construction. These rules prevail where they are not restrained by the clear language of the statute. Under this rule, general terms in a statute should be so limited in their application as not to lead to absurd consequences.

■ Finally, the Newport ordinance is not unconstitutionally vague as applied to these defendants. Any reasonable person, either a patron or an employee of the Mousetrap, would have known that it was a public club open to the public.

There is no evidence to show that the Newport ordinance is arbitrary or does not provide fair notice to any reasonable person. The contemporary source of the "overbreadth" doctrine is *Thornhill v. Alabama,* 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940), which determined that the very existence of some broadly written statutes may have such a detrimental effect on free expression that they should be subject to challenge even by a party whose own conduct may be unprotected. Inherent in this theory is that the very existence of a statute or ordinance may cause others not before the court to refrain from otherwise constitutionally protected expression.

The overbreadth doctrine is itself inherently plagued by the very real prospect of being selectively and subjectively applied and of being fatally flawed as vague. Overbreadth itself is intrinsically speculative in nature. *Broadrick v. Oklahoma,* 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973) recognizes the burden that unbridled application of the overbreadth doctrine could place on the judicial system. It was clear that almost any law could be applied in such a way as to infringe upon some form of protected speech or conduct. This potential application and extreme abstract application of laws was halted by the majority. The overbreadth doctrine is limited and:

Attenuates as the otherwise unprotected behavior that it forbids the state to sanction moves from "pure speech" toward conduct, and that conduct—even if expressive—falls within the scope of otherwise valid criminal laws that reflect legitimate state interests in maintaining comprehensive controls over harmful, constitutionally unprotected conduct.

. . . .

To put the matter another way, particularly where conduct and not merely speech is involved, we believe that the overbreadth of a statute must not only be real but substantial as well, judged in relation to the statute's plainly legitimate sweep.

This requirement of substantial overbreadth was echoed in *New York v. Ferber,* 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982), where the court upheld a statute prohibiting distribution of child pornography. Although admitting that some speech forbidden under the statute could in fact be protected, the court did not find the potential inhibition of that speech significant enough to find that the statute was "substantial" in its overbreadth.

■ Where conduct and not merely speech is involved, the overbreadth effect of a statute must not only be real, but substantial as well, and judged in relation to the law's plainly legitimate sweep. *Cf. Broadrick, supra.* The concept of substantial overbreadth is not readily reduced to an exact definition. The mere fact that one can conceive some impermissible application of a statute is not sufficient to render it susceptible to an overbreadth challenge. *Members of the City Council of the City of Los Angeles v. Taxpayers for Vincent, et al.,* 466 U.S. 789, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984).

As noted in *Vincent, supra,* there must be a real danger that the law or statute in question will significantly compromise recognized First Amendment protections of parties not before the court for it to be facially challenged on overbreadth grounds.

■ It is well settled that the state may legitimately exercise police power to advance aesthetic values. *Vincent.* The concept of public welfare is broad and inclusive. The values it protects are spiritual as well as physical, aesthetic as well as monetary. *Berman v. Parker,* 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954).

■ The city's interest in attempting to preserve or improve the quality of urban life is one which must be accorded high respect. *Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976). We must agree with the circuit court when it distinguished this situation from one in which *Musselman v. Commonwealth,* Ky., 705 S.W.2d 476 (1986) could be applied. In this case, the words of the city ordinance are not ambiguous and it is not necessary for the court to construe the statute so as to render it constitutional. Here the language and intent are clear, and it is totally unnecessary for the judiciary to add any new language in order to provide new meaning necessary to render the ordinance constitutional. Conversely, judicial authority should be severely restrained when it seeks to determine that a statute or ordinance is facially unconstitutional without substantial supporting authority based on logical legal reasons. Here, the city ordinance prohibits a person from appearing nude in any public place. The Newport ordinance does not improperly infringe on any constitutionally protected right. It is not vague and it is not overbroad. The ordinance in question defines the criminal offense of appearing nude in public with sufficient clarity that any reasonable or ordinary person can understand what conduct is prohibited.

It could always be argued with perfect hindsight that there might well be a better way to write an ordinance prohibiting public nudity so as to have the perceived effect of a less severe restriction of expressive activity such as nude dancing in a private place. As noted in *Vincent,* in a case involving political sign prohibition in California, the city may properly decide that aesthetic interest in avoiding visual clutter justifies the enactment of the pertinent ordinance. In California, it was the removal of all signs creating or increasing visual clutter. In Newport, it is the prohibition of public nudity. It is well settled that a state may legitimately exercise its police power to advance aesthetic values. The concept of public welfare is broad and inclusive. The values it represents are spiritual as well as physical, aesthetic as well as monetary. *Berman v. Parker,* 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954), quoted in *Vincent.*

It is the holding of this Court that the Newport ordinance is constitutional and is not overbroad or vague. The ordinance applies to public places such as the Mousetrap Society where the defendants appeared in the nude. The Mousetrap Society is not a private club but rather a public club and a place of public accommodation.

The judgments of the circuit court and district court are affirmed.

LAMBERT, REYNOLDS and SPAIN, JJ., concur.

LEIBSON, J., dissents by separate opinion in which STEPHENS, C.J., and COMBS, J., join.

LEIBSON, Justice, dissenting.

Respectfully, I dissent.

The Majority Opinion is mixing apples and oranges. It would be perfectly proper, constitutionally, for Newport to write an ordinance prohibiting public nudity in a place like the Mousetrap. The problem is it chose to write this particular ordinance, which defines "public place" by reference to KRS 525.-010(3), and as such prohibits nudity in other circumstances where to do so impairs constitutionally protected freedom of expression. The case in point is *Doran v. Salem Inn,* 422 U.S. 922, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975), not *Barnes v. Glen Theatre, Inc.,* 501 U.S. ——, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991).

In *Doran,* the Supreme Court held that the District Court had not erred in granting a preliminary injunction against the enforcement of an ordinance similar to the Newport ordinance. The Supreme Court agreed with the District Court that the statute was overbroad because "there is no limit to the inter-

pretation of the term 'any public place.' " *Doran, supra,* 422 U.S. at 933, 95 S.Ct. at 2568, 45 L.Ed.2d at 660.

On the other hand, in *Barnes,* a plurality of the Supreme Court used a four-part test to determine the statute in question was constitutional only because the Indiana Supreme Court "has construed the Indiana statute to preclude nudity in what are essentially public accommodations such as Glen Theatre and the Kitty Kat Lounge." *Barnes, supra,* 501 U.S. at ——, 111 S.Ct. at 2460, 115 L.Ed.2d at 511.

Sure, the City of Newport could draft an ordinance prohibiting nude dancing for commercial purposes at strip joints, and the Mousetrap would qualify despite its feeble attempts at subterfuge. But instead of drafting an ordinance narrowly tailored to achieve a constitutionally permissible purpose, the ordinance borrows the definition of "public place" from the riot and disorderly conduct statute, which defines "public place" in broad terms:

> " 'Public place' means a place to which the public or a substantial group of persons has access and includes but is not limited to highways, transportation facilities, schools, places of amusements, parks, places of business, playgrounds and hallways, lobbies and other portions of apartment houses and hotels not constituting rooms or apartments designed for actual residence. An act is deemed to occur in a public place if it produces its offensive or proscribed consequences in a public place." KRS 525.010(3).

While a broad definition is suitable for prohibiting disorderly conduct, it is not suitable for prohibiting nude dancing which, unlike disorderly conduct, may implicate freedom of expression.

Our previous decision in *Musselman v. Commonwealth,* Ky., 705 S.W.2d 476 (1986), should control our decision here. In it we held that the harassment statute, KRS 525.-070(1)(b), was impermissibly broad because the definition was not "restricted to 'fighting words' or words 'which have a direct tendency to cause acts of violence by the person to whom ... addressed.' " *Id.* at 477. While a constitutional statute, with a perfectly appro-

priate narrow definition of harassment confined to "fighting words" could have been written, and such a statute would have been more than adequate to cover the outrageous coarse and abusive language Musselman used toward a police officer, in Kentucky the judiciary does not presume to rewrite statutes facially unconstitutional, to make them constitutional. This is a legislative, not a judicial, function. In *Commonwealth v. Foley,* Ky., 798 S.W.2d 947, 948 (1990), we wrote:

> "[I]t is of no moment that the conduct alleged in the indictment could be constitutionally prohibited and criminalized. The statute must be tested on the basis of what is said rather than what might have been said."

The Newport ordinance fails this test. What is critical in *Foley* in deciding whether a statute intended to stop election bribery and vote buying is constitutionally overbroad, is equally appropriate for a Newport ordinance to stop nude dancing.

The U.S. Supreme Court makes no distinction between state statute as written and state statute as judicially construed in deciding whether the state law violates freedom of expression, *but we do.* The U.S. Supreme Court accepts "casus omissus," i.e., a cure of the omission (of the statutory deficiency) by state court decision, *but we do not.* The reasons that underlie the U.S. Supreme Court decisions in both *Barnes v. Glen Theatre, Inc., supra,* wherein the Indiana Supreme Court cured the Indiana statute, and *Gooding v. Wilson,* 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972), wherein the Georgia Supreme Court cured the Georgia statute on harassment by providing a judicial definition limited to "fighting words," do not apply here. Until this case our Court has refused to provide a "casus omissus." The Majority Opinion is squarely in conflict with the *Musselman* case where we so refused, and with the *Foley* case where we so refused, and with a number of other Kentucky cases to the same effect cited therein. Our Court has no power to restrictively apply a statute or ordinance that is unconstitutionally overbroad to make it constitutional.

Our opinions should clarify the law, not confuse it; refine it, not adulterate it. While the result achieved in this case may appear just (to most everyone but the Mousetrap) the methodology is flawed. We cannot afford the price we pay here in damage to basic principles while seeking to reach a just result.

STEPHENS, C.J., and COMBS, J., join.